UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNKECHAUG INDIAN NATION and      :
HARRY B. WALLACE,               :
                                      :
          Plaintiffs,           :
                                        :
          v.                 :       **DECISION & ORDER**
                                      :       18-CV-1132 (WFK) (AYS)
NEW YORK STATE DEPARTMENT OF  :
ENVIRONMENTAL CONSERVATION and  :
BASIL SEGGOS *in his official capacity as the*  :
*Commissioner of the New York State*    :
*Department of Environmental Conservation*,  :
                                        :
          Defendants.       :
-------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

Unkechaug Indian Nation (the "Nation") and Harry B. Wallace (collectively, "Plaintiffs") bring this action pursuant to 25 U.S.C. § 2201 and Fed. R. Civ. P. 65 seeking a permanent injunction and declaratory judgment against the New York State Department of Environmental Conservation ("NYSDEC") and Basil Seggos, the NYSDEC Commissioner (collectively, "Defendants"). In the Complaint filed on February 21, 2018, Plaintiffs allege NYSDEC's regulations unlawfully interfere with Plaintiffs' fishing rights in designated Reservation areas and in customary fishing waters. ECF No. 1. Specifically, Plaintiffs argue their fishing rights are protected by treaty and enforceable against NYSDEC, NYSDEC's regulations are preempted by federal law, and NYSDEC's regulations interfere with tribal self-government and impair Plaintiffs' freedom of religious expression. On October 1, 2021, Defendants and Plaintiffs filed fully-briefed cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56. ECF Nos. 98, 104. For the reasons stated below, Defendants' Motion for Summary Judgment at ECF No. 98 is GRANTED and Plaintiffs' Motion for Summary Judgment at ECF No. 104 is DENIED.

**BACKGROUND**

       The Unkechaug Indian Nation (the "Nation") is recognized under both federal and New

York state law. *See* Compl. ¶ 2 (citing *Gristede's Foods, Inc. v. Unkechuage Nation*, 660 F. Supp.

2d 442, 469-70 (E.D.N.Y. 2009) (Matsumoto, J.)); N.Y. Indian Law § 2. On February 21, 2018,

the Nation and its chief, Harry B. Wallace ("Chief Wallace"), (collectively, "Plaintiffs") filed a

Complaint against the New York State Department of Environmental Conservation ("NYSDEC")

and Basil Seggos, the NYSDEC Commissioner (collectively, "Defendants").  *See* Compl. ¶ 1, ECF No. 1.  Plaintiffs bring this action pursuant to 25 U.S.C. § 2201 and Fed. R. Civ. P. 65, seeking a judgment from this Court that they are not subject to Defendant NYSDEC's regulations and enforcement authority over fishing in reservation lands and Unkechaug customary fishing waters. *Id.*  Specifically, Plaintiffs challenge Defendants' attempts to regulate, restrict, and criminally prosecute Plaintiffs for fishing in their reservation and customary fishing waters and allege their claims accord with inherent native sovereignty, religious freedom and expression, treaties, and other federal laws.  *Id.*

At the heart of this case is New York State's effort to conserve the American eel (*Anguilla rostrata*) species.  The American eel represents an important resource for both biodiversity and human use.  Kerns Dec., ECF No. 101, Ex. 5 at 17.  This species possesses significant ecological, cultural, and commercial value and has therefore been the subject of increasingly stringent protection at the federal and state level.  The Atlantic States Marine Fisheries Commission ("ASMFC" or "the Commission"), a congressionally authorized interstate regulatory body comprised of scientists and marine policy experts, controls much of the species' oversight protection.  *See* Kerns Dec., Ex. 4 (Atlantic States Marine Fisheries Commission, Interstate Fisheries Management Program Charter). [1]

The Commission has tracked trends in the American eel's population over the past few decades.  According to ASMFC studies, the American eel population has been steadily declining

---

[1] ASMFC was developed in response to the Atlantic Coastal Fisheries Cooperative Management Act of 1993, which "provided the Commission with responsibilities to ensure member state compliance with interstate fishery management plans."  Kerns Dec., Ex. 4, at 3.  The body is overseen by representatives of the fifteen states bordering the Atlantic Ocean, including New York.  *Id.*; *see generally* Kerns Dec., ECF No. 101 (providing a detailed overview of the ASMFC, including the processes by which the Commission promulgates American Eel Stock Assessment Reports, Fishing Management Plans, and supplemental addenda thereto).

since the 1990s.[2]   In an attempt to preserve the species' population, the Commission has implemented various regulatory measures.  *See* Kerns Dec., Ex. 4 at 16.  The Commission, together with the fifteen Member States which comprise the organization, carry out this mandate by generating Fishery Management Plans ("FMPs").   16 U.S.C.  § 5104(a) (prescribing state implementation of coastal fishery management plans; detailing coastal fishery management plans). The Commission first adopted an FMP  pertaining to American eels in the 1990s.  *See* Def's Mot. for Summary Judgment ("Def's Mem."), ECF No. 99 at 20.  The FMP statutorily required ASMFC Member States—including New York—to impose fishing regulations with respect to the American eel in an attempt to conserve the species.  *See* 16 U.S.C. § 5104(b) (setting forth state implementation and enforcement obligations) ("Each State identified under [16 U.S.C. § 5104(a)] with respect to a coastal fishery management plan shall implement and enforce the measures of such plan within the timeframe established in the plan.").

Despite the efforts of the Commissions and its Member States, ASMFC reports compiled in 2012 and 2017 confirmed the species' population continued to decline.  *Id.*; *see also* Kerns Dec., Ex. I at 14-33 (2017 ASMFC American Eel Stock Assessment Update stating the American eel's population is in a "depleted state").  Indeed, the rate of the American eel's population decline has worsened in recent years due to the emergence of a lucrative overseas trade in the species, which has further spurred overfishing.  *Id.* at 10; *see also* Def's Mem. at 17.

In an effort to combat this precipitous population decline, the ASMFC adopted Addenda III (2013) and IV (2014) to the FMP.  *See* Kerns Dec., Ex. G; H.  These new regulations impose greater fishing limitations on American eels, including stricter size and catch restrictions.  *Id.*  As an  ASMFC Member State, New York is required to adopt and enforce the FMP and the

---

[2] *See* Def's Mot. for Summary Judgment, ECF No. 99 at 15-18 (providing a historical summary of the American Eel's population decline in the Atlantic marine ecosystem).

supplemental Addenda thereto pursuant to 16 U.S.C. § 5104.  *See also* Kreshik Dec., ECF No. 102 ¶ 5.  Accordingly, the State promulgated N.Y.C.R.R. §§ 10.1 (a) and (b) and 40.1(f) and (i), making it illegal to take or possess American eels less than nine inches long, which includes all juvenile eels, also known as "glass eels."  *Id.*; *see also* Kerns Dec. ¶ 35.

The State's attempt to regulate fishing, including its ban on taking glass eels in non-reservation customary fishing waters, is at the core of Plaintiffs' case.  Plaintiffs claim fishing and whaling have been the Nation's "main economic engine" for "time immemorial."  Compl. ¶¶ 2, 28.  Plaintiffs also allege Nation members require access to their customary fishing waters to gather crustaceans and shells in order to make wampum[3] for religious and cultural uses, and that the State's regulations interfere with this practice.  *Id.* ¶¶ 2, 27.

Throughout their Motion for Summary Judgment, Plaintiffs reiterate fishing's historical, cultural, and economic significance.  *See* Pls. Mot. for Summary Judgment ("Pls. Mot."), ECF No. 104; Memorandum in Support of Pls. Mot. for Summary Judgment ("Pls. Mem."), ECF No. 105.  Indeed, in their fully-briefed motion filed October 1, 2021, Plaintiffs challenge Defendants for having subjected Plaintiffs—and Plaintiff Chief Wallace in particular—to threats and fear of criminal prosecution for exercising their right to fish in reservation and customary fishing waters.  *Id.* at 25.  In particular, Plaintiffs claim Defendants confiscated fish and fishing equipment from Nation members and issued criminal summonses to other Nation members for fishing on reservation lands and in Unkechaug customary fishing waters.  *Id.*  Plaintiffs further allege Hugh Lambert Mclean, an Assistant New York State Attorney General, threatened to criminally prosecute Chief Wallace for unlawfully selling glass eels in violation of New York State's environmental law.  *Id.* at 26.

---

[3] Wampum refers to traditional shell beads.  *See generally* Pls. Mot. for Summary Judgment ("Pls. Mot."), ECF No. 104.

Plaintiffs detail these accusations further in their Motion for Summary Judgment before the Court. Indeed, Plaintiffs argue they have proved they are likely to succeed on the merits in all causes of action asserted in the Complaint and set forth in their instant motion. That is to say, Plaintiffs argue they have proved:

(i)     The NYSDEC regulations are preempted by federal law and impair tribal self-government. Pls. Mem. at 77-80, 109; *see also* Compl. ¶¶ 34-39;[4]

(ii)    The Unkechaug Andros Treaty is enforceable against NYSDEC regulations. Pls. Mem. at 40-77, 107; *see also* Compl. ¶¶ 55-56;

(iii)   NYSDEC Commissioner Seggos and Deputy Commissioner Thomas Berkman violated federal law by enforcing NYSDEC regulations against the Unkechaug contrary to the Nation's treaty rights and federal law. Pls. Mem. at 80-85, 105; *see also* Compl. ¶¶ 34-39, 42-45; and

(iv)    The NYSDEC regulations interfere with the Unkechaug's freedom of religion. Pls. Mem. at 110; Compl. ¶¶ 46-53.

On the other hand, Defendants argue:

(i)     The NYSDEC's regulations are not preempted. Def's Mem. at 43;

(ii)    Plaintiffs are not entitled to relief under the Free Exercise Clause. *Id.* at 46;

(iii)   Plaintiffs are not exempt from NYSDEC's regulations by virtue of the Andros Order, even if the Court were to construe said Order as a treaty. *Id.* at 55;

---

[4] 25 U.S.C. § 232 provides in relevant part: "The State of New York shall have jurisdiction over offenses committed by or against Indians on Indian reservations within the State of New York . . . Provided, That nothing contained in this section shall be construed to deprive any Indian tribe, band, or community, or members thereof, hunting and fishing rights as guaranteed them by agreement, treaty, or custom . . . ."

    (iv)    Plaintiffs' sovereignty claims, separate from the Andros Order, also fail. *Id.* at 67; and

    (v)    The Andros Order is not a treaty and does not preclude state regulation. *Id.* at 67.

For the reasons set forth below, this Court finds for Defendants on each of their claims recounted *supra* in points (i) through (v): NYSDEC's regulations are neither preempted by federal nor state law; the Andros Order and NYSDEC's regulations are reconcilable; and Plaintiffs are not entitled to relief under the Free Exercise Clause of the First Amendment.

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" by citation to materials in the record, including depositions, affidavits, declarations, and electronically stored information. Fed. R. Civ. P. 56(a)-(c). Affidavits and declarations, whether supporting or opposing a summary judgment motion, "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.*; *see also Patterson v. Cty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). A genuine dispute exists if a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001). In determining whether summary judgment is appropriate, courts must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation and internal quotation marks omitted). The role of the district court is not to weigh the evidence and determine the truth of the matter, but rather to answer "the

threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 24950.

If the moving party carries its preliminary burden, the burden shifts to the non-movant to raise the existence of "specific facts showing that there is a genuine issue for trial." *Cityspec, Inc. v. Smith*, 617 F. Supp. 2d 161, 168 (E.D.N.Y. 2009) (Wexler, J.) (quoting *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence" in support of the non-movant will not alone defeat a summary judgment motion. *Anderson*, 477 U.S. at 252. Rather, the non-moving party must make a showing sufficient to establish the existence of each element constituting its case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ("[A] complete failure of proof concerning an essential element of the nonmov[ant]'s case necessarily renders all other facts immaterial."). Conclusory statements, devoid of specifics, are insufficient to defeat a properly supported motion for summary judgment. *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

## ANALYSIS

As a threshold matter, this Court must address all jurisdictional arguments before reaching the merits of this case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 84 (1998). Defendants raise two such arguments here. First, they claim this Court lacks jurisdiction to review Plaintiffs' causes of action on the grounds Defendants are immune from suit under the Eleventh Amendment. Def's Mem. at 31. Second, Defendants argue Plaintiffs' claims are precluded from review under the doctrines of *res judicata* and collateral estoppel. *Id.* at 39. For the reasons to follow, this Court finds both arguments unpersuasive.

I.      **The Eleventh Amendment**

The parties do not dispute Defendant NYSDEC is a state agency, and Defendant Seggos is a state official.  Therefore, it is essential for this Court to consider whether it may exert jurisdiction over Defendants or whether they are immune from suit by virtue of the Eleventh Amendment to the U.S. Constitution.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  "A State is thus immune from suits in federal court brought by its own citizens and such immunity extends to officers acting on behalf of the State."  *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 243 (E.D.N.Y. 2015) (Kuntz, J.) (internal citation and quotation marks omitted).  State agencies acting as "arms of the state" are also entitled to sovereign immunity under the Eleventh Amendment.  *McGinty v. New York*, 251 F.3d 84, 95-96 (2d Cir. 2001).  Moreover, sovereign immunity applies to suits against states brought by Indian tribes.  *See Seminole Tribe v. Florida*, 517 U.S. 44, 55 (1996).

There are three exceptions to Eleventh Amendment immunity.  Namely, this protection does not apply if (1) a state waives its immunity; (2) Congress clearly abrogates state sovereign immunity; or (3) the suit is against a state official and seeks prospective relief.  *See Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 254-55 (2011); *Lapides v. Bd. of Regents*, 535 U.S. 613, 619 (2002); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455-56 (1976).

Plaintiffs argue Defendants expressly waived Eleventh Amendment immunity by coercing Plaintiffs to initiate the present case in bad faith.  Pls. Mem. at 85.  Defendants reject this argument in full, arguing the State Defendants' Eleventh Amendment immunity has neither been abrogated

nor waived.  They also argue the relief sought by Plaintiffs is unavailable in federal court under the *Ex Parte Young* exception as established by the Supreme Court in *Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261 (1997) and the Second Circuit in *Western Mohegan Tribe & Nation v. Orange County*, 395 F.3d 18 (2d Cir. 2004).  Lastly, Defendants add, Plaintiffs' sovereignty and treaty claims are barred from review in accordance with the *Pennhurst* doctrine as these claims allegedly sound in state law.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984).

This Court agrees with Defendants insofar as it finds neither the waiver nor abrogation exception apply here.  However, the Court disagrees with Defendants' *Ex Parte Young* analysis. This exception to Eleventh Amendment immunity does apply with respect to Plaintiffs' claims against Defendant-NYSDEC officials in light of the Second Circuit's recent holding in *Silva v. Farish*, No. 21-616 (2d Cir. 2022).

As an initial matter, neither party argues Congress abrogated Defendants' Eleventh Amendment Immunity.  This Court agrees.  This exception to Eleventh Amendment immunity is inapplicable to the case at hand and therefore the following analysis omits any discussion of abrogation.  Instead, the Court first proceeds by addressing the issue of waiver—namely, by discussing why this exception does not apply here—before it applies the *Ex Parte Young* exception to the case at bar in light of the recent *Silva* ruling.

A.    Waiver

Waiver, or consent to suit, is not lightly inferred; federal courts strictly construe statutes which purportedly provide consent to suit.  *See Edelman v. Jordan*, 415 U.S. 651, 673-74 (1974); *Great N. Life Ins. Co. v. Read*, 322 U.S. 47, 53-54 (1944).  A state waives immunity by, for example, subjecting itself to suit in federal court.  *Lapides*, 535 U.S. at 618-20.  However, it does not waive immunity by consenting to suit in its own courts.  *Id.*

In the instant action, Plaintiffs argue the State, acting through its legal counsel, coerced Plaintiffs into filing the instant action and that such coercion constitutes waiver for Eleventh Amendment purposes. Pls. Mem. at 85. This Court disagrees.

As previously stated, "[t]he test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one. . .waiver of a State's Eleventh Amendment immunity will not be found unless such consent is unequivocally expressed." *Boddie v. New York State Div. of Parole*, 08-CV-911, 2009 WL 1033786, at *4 (E.D.N.Y. Apr. 17, 2009) (Matsumoto, J.), *opinion modified on denial of reconsideration*, 08-CV-911, 2009 WL 1938981 (E.D.N.Y. July 7, 2009) (quoting *Close v. New York*, 125, F.3d 31, 39 (2d Cir. 1997) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984))) (quotations omitted). "States cannot 'constructively consen[t]' to waiver of their Eleventh Amendment protection from suit." *Santiago v. N.Y. State Dep't of Corr. Servs.*, 945 F.2d 25, 30 (2d Cir. 1991) (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)). States themselves must decide to waive their immunity in federal court. *Id.* Indeed, "waiver will only be found. . .where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Id.* (quoting *Edelman*, 415 U.S. at 673).

Plaintiffs fail to demonstrate how Defendants' actions, or the actions taken by other state officials acting on their behalf, constitute waiver of Eleventh Amendment immunity. Importantly, neither party contends Defendant NYSDEC or Defendant Seggos directly waived sovereign immunity. Rather, Plaintiffs argue Defendants indirectly waived their sovereign immunity when New York State Assistant Attorney General Hugh McLean allegedly coerced Plaintiffs into filing the instant case in federal court. Pls. Mem. at 87. Plaintiffs also argue Defendants waived their privileges under the Eleventh Amendment when they voluntarily invoked federal jurisdiction—

10

that is, to the extent Defendants submitted their rights to judicial determination by a federal court. *Id.* at 86-87.  Neither of these claims are true.

With respect to the latter point, Plaintiffs argue a state's voluntary appearance in federal court amounts to waiver of Eleventh Amendment immunity, and they cite a number of Supreme Court cases allegedly supporting this proposition.  Pls. Mem. at 86.  The first of these cases is *Clark v. Barnard*, 108 U.S. 436, 447 (1883).  However, there is a clear distinction between *Clark* and the instant matter, because in *Clark*, the state-party appeared as an intervener, in contrast to the position of Defendants here.  *Id.* (stating the fact that the state sought affirmative relief was dispositive to finding waiver). *But see Missouri v. Fiske*, 290 U.S. 18, 25 (1933) (holding "intervention was too limited in character to constitute a waiver.").  Plaintiffs next cite the Supreme Court's ruling in *Gardner v. New Jersey* in support of their waiver argument.  Pls. Mem. at 86; 329 U.S. 565, 574 (1947).  Yet Plaintiffs again fail to distinguish the fact the state-party in *Gardner* voluntarily filed their case in federal court as opposed to the State-Defendants here who were brought into this action on Plaintiffs' accord rather than their own. Plaintiffs also attempt to bolster their argument by invoking the Supreme Court's ruling in *Gunter v. Atlantic Coast Line R. Co*, 200 U.S. 273 (1906), arguing *Gunter* and its progeny support the longstanding principle "where a State voluntarily becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment."  Pls. Mem. at 87 (quoting *Gunter*, 200 U.S. at 284).

It appears to this Court that by referencing this line of cases Plaintiffs mean to imply New York State voluntarily consented to federal jurisdiction over the suit at bar simply because it chose to defend itself against the instant allegations.  This is not so.  *See Quirk v. DiFiore*, 582 F. Supp. 3d 109, 113–14 (S.D.N.Y. 2022) (distinguishing *Quirk* from *Gunter* on the grounds the latter

"stand[s] for the proposition that a state waives its Eleventh Amendment sovereign immunity when it voluntarily becomes a party to a suit *and* submits its rights for judicial determination." (referencing *Gunter*, 200 U.S. at 284) (emphasis added)).  A state-party does not waive immunity merely by defending itself against claims in court.  *Id.* (referencing *NRA of Am. v. Cuomo*, 525 F. Supp. 3d 382, 407 (N.D.N.Y. 2021), *rev'd on other grounds, NRA of Am. v. Vullo,* 49 F.4th 700 (2d Cir. 2022) ("New York has not unequivocally expressed waiver of immunity, nor has it waived this immunity simply by defending the claims against it. To hold otherwise would mean a waiver of sovereign immunity occurs every time a State appears in federal court to defend itself in litigation. Such a result is not supported by either case law or logic.")).  This Court agrees. Defendants have not availed themselves of the federal courts beyond defending against the instant claims.  This does not amount to waiver.

Moreover, this Court is also not convinced AAG McLean waived the State's sovereign immunity, either explicitly or implicitly; nor is the Court convinced AAG McLean *could* waive such immunity even if he wished to—which, to be sure, the Court does not so find.  Nothing in the evidence before the Court suggests AAG McLean intended to waive sovereign immunity on behalf of the State-Defendants.  AAG McLean's interaction with Plaintiffs is traceable to the incident occurring on April 6, 2016 when NYSDEC law enforcement officers seized a shipment of glass eels belonging to Plaintiffs from the customs area at John F. Kennedy ("JFK") Airport . Compl. ¶ 23; Kreshik Decl. ¶ 16, Ex. C (noting the seizing officers were acting pursuant to their authority under ECL § 71-09079(4)(4)). Following this incident, Plaintiffs allege AAG McLean "threatened to criminally prosecute [Plaintiff Wallace] . . . unless the Nation would file an action in Federal Court asserting its rights."  Compl. ¶ 25 (referring to Plaintiffs' alleged treaty right to fish in

12

Reservation and customary Unkechaug fishing waters without being subject to NYSDEC regulations). This does not amount to waiver.

Beyond referencing this alleged interaction between Plaintiffs and AAG McLean, Plaintiffs did not adduce any additional evidence to demonstrate AAG McLean intended to waive Defendants' immunity. Nor did Plaintiffs show how AAG McLean's interaction with Plaintiff Wallace could reasonably be construed as a "threat" or a viable means by which to "coerce" Plaintiffs into filing the instant suit. This Court takes as true Plaintiff Wallace's declaration, in which he stated he was threatened with "criminal felony prosecution by New York State Assistant Attorney General Hugh Lambert McClan [sic]" but also notes Plaintiff Wallace himself claimed this interaction occurred "[o]n or about 2017." Wallace Dec., ECF No. 31-1 at 3. This begs the question: why would AAG McLean seek to pressure Plaintiff Wallace to file in federal court in 2017 when, by this point in time, Plaintiffs had already filed an action against Defendants in state court for the same underlying incident, and that case had already been dismissed for failure to state a claim? *See* Kreshik Dec., ECF No. 102, Ex. D (Plaintiffs' State Court Complaint); *see id.*, Ex. I (New York Supreme Court Order) (dismissing Plaintiffs' Complaint, dated October 12, 2016). The logic does not follow.

Throughout the correspondence cited to the Court between Defendants, other NYSDEC employees, and officials in the State's Attorney General's Office, there is no indication AAG McLean or Defendant Seggos attempted to coerce Plaintiffs to file in federal court. *Cf.* Pls. Mem. 81-82; Pls. Reply, ECF No. 111 at 52-65. At most, Plaintiffs demonstrate the State's Attorney General's Office was in communication with Defendant NYSDEC regarding developments in the instant litigation and in the State Action. *Id.* But this does not amount to waiver. To be clear, nothing in the materials before the Court suggests an attempt by Defendants, or AAG McLean on

behalf of Defendants, to coerce Plaintiffs into filing the instant action in federal court, or that Defendants were otherwise availing themselves of the judicial power of the State or federal government such that the Court could perhaps find inadvertent waiver sufficient to overcome the privilege of sovereign immunity.

However, the Court's inquiry into the Eleventh Amendment does not end here.

B.      Ex Parte Young

As determined by the Supreme Court in *Ex Parte Young*, the third exception to sovereign immunity provides "the Eleventh Amendment does not bar a suit against a state official when that suit seeks . . . prospective injunctive relief." *Seminole Tribe*, 517 U.S. at 55 (citing *Ex Parte Young*, 209 U.S. 123 (1908)).   The *Ex Parte Young* exception exists because "when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Office*, 563 U.S. at 254.  For this exception to apply, the state official does not need to have allegedly violated the law before he or she may be sued, since the relief sought is prospective in nature.  *See Ex Parte Young*, 209 U.S. 123 (1908) (upholding injunction against state attorney general preventing him from enforcing a railroad rate-reduction law that provided severe penalties for noncompliance).  Again, this exception "applies only to prospective relief, [it] does not permit judgments against state officers declaring that they violated federal law in the past, and has no application in suits against the States and their agencies, which are barred regardless of the relief sought." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (citation omitted).

Defendants argue the *Ex Parte Young* exception does not apply to Defendant NYSDEC or Defendant Seggos, acting in his official capacity, pursuant to the Supreme Court's holding in *Coeur d'Alene* and the Second Circuit's holding in *Western Mohegan*.  Def. Mem. at 34.  As a

14

threshold matter, Defendants argue "the *Ex Parte Young* exception to Eleventh Amendment immunity applies to individual officials, not to state agencies such as DEC." *Id.* (referencing *Seminole Tribe*, 517 U.S. at 74).  Next, Defendants argue Plaintiff's suit is barred by *Coeur d'Alene*, in which the Supreme Court held "the Eleventh Amendment barred a Native American tribe seeking prospective injunctive relief against state officials, where the suit sought declaratory relief concerning the tribe's exclusive use, occupancy and right to quiet enjoyment of 'the submerged lands and bed of Lake Coeur d'Alene and of the various navigable rivers and streams that form part of its water system.'" *Id.* (quoting *Coeur d'Alene,* 521 U.S. at 264).

On the other hand, Plaintiffs argue the conclusion reached by the Supreme Court in *Coeur d'Alene* does not apply to this case. This is "based on the fact that the Plaintiffs do not seek fee simple title to New York's waters or because the property right they claim is non-exclusive." *Id.* at 35. That is, in Plaintiffs' view, because the Second Court has previously barred a plaintiff's suit based on the Eleventh Amendment because "[the plaintiff-] Tribe's claims were 'fundamentally inconsistent with the State of New York's exercise of fee title over the contested areas' and [because plaintiffs] effectively sought a 'determination that the lands in question are not even within the regulatory jurisdiction of the State.'" *Id.* (quoting *Western Mohegan*, 395 F.3d at 23 (referencing *Coeur d'Alene*, 521 U.S. at 282)) (internal quotation marks omitted). This Court agrees.

Highly instructive in the instant case is the Second Circuit's recent decision in *Silva v. Farish*, No. 21-616. Particularly relevant for present purposes is the appellate court's analysis of *Coeur d'Alene*, *Western Mohegan*, and *Ex Parte Young*.

In *Silva*, the court applied similar questions of law to facts not unrelated to those at bar. The plaintiffs in *Silva*, similarly to Plaintiffs in this case, "[sought] a declaration that the law grants

them a right to fish in the Shinnecock Bay without interference and that the DEC officials are unlawfully denying them that right" by enforcing against them N.Y.C.R.R. § 40.1(b)—the State's prohibition against possessing eels of a certain size—and for otherwise interfering with their right to fish in customary Shinnecock fishing waters.  *Silva*, No. 21-616 at 6-7, 11.  In turn, the *Silva* defendants, which included NYSDEC and Seggos, in his capacity as NYSDEC Commissioner, argued—as they do here—*Coeur d'Alene* and *Western Mohegan* barred plaintiff Silva's suit.  The Second Circuit rejected this argument on the grounds that "[u]nlike the tribes in *Coeur d'Alene* and *Western Mohegan,* the plaintiffs' request for relief in this case would not transfer ownership and control of the Shinnecock Bay from the state to an Indian tribe. Nor would it allow the plaintiffs to prevent others from fishing in the Shinnecock Bay."  *Id.* at 11-12.  The court added, "[i]t would merely resolve the plaintiffs' individual claims that they have their own right to fish there[,]" reasoning "[i]f the plaintiffs succeed in obtaining their requested relief, at most the state would need to tailor its regulatory scheme to respect the plaintiffs' fishing right."  *Id.* at 12.  In other words, because plaintiffs did not seek a right to "exclude all others[,]"  *id.* (referencing *Western Mohegan*, 395 F.3d at 22), the case was a "'typical *Young* action,' …[seeking] to 'bring the state's regulatory scheme into compliance with federal law.'"  *Id.* (quoting *Coeur d'Alene,* 521 U.S. at 289 (O'Connor, J., concurring in part and concurring in the judgment)).  The same reasoning applies here.

Plaintiffs in this case do not seek to "divest the state of its ownership" of any lands or waters.  *Id.* at 13.  Rather, they seek a declaration from this Court that Defendants NYSDEC and Seggos have interfered with their established right to fish in Reservation and customary Unkechaug fishing waters without regulatory interference by the State, and to permanently enjoin the State-Defendants from interfering with said right in the future.  Plaintiffs' suit neatly accords

16

with *Silva*.  Therefore, this Court finds, as the *Silva* court previously ruled, the instant case is "not effectively one against the state."  Rather, Plaintiffs' "claims [are] seeking prospective relief against DEC officials," namely, Defendant Seggos in his official capacity, and thus "fall within the *Ex Parte Young* exception to state sovereign immunity[,] and accordingly may proceed."  *Id.* at 13.

       C.    *Pennhurst* Doctrine

       Defendants also argue "the *Pennhurst* doctrine poses a separate and independent Eleventh Amendment bar to consideration of the Plaintiffs' non-federal claims."  Def. Mem. at 39 (referencing *Pennhurst*, 465 U.S. at 106).  In *Pennhurst,* the Supreme Court ruled the Eleventh Amendment bars any federal action against a state officer for an alleged violation of state law. *Pennhurst*, 465 U.S. at 106.  *See Vega v. Semple*, 963 F.3d 259, 284 (2d Cir. 2020) ("To the extent Plaintiffs seek prospective relief . . . for violations of the '[state] Constitution' and 'state law,' those claims are indeed barred by the Eleventh Amendment under the Pennhurst doctrine." (internal reference omitted)).  Defendants argue Plaintiffs' second and fourth causes of action, pertaining to its inherent sovereignty and treaty-based claims, are thus barred.  Def. Mem. at 38. However, Defendants do not challenge Plaintiffs' first and third claims, which assert federal pre-emption and a violation of the First Amendment's Free Exercise Clause, respectively, on this basis, as they concede these claims are federal in nature.  *Id*.  The Court declines to address this issue here.  It chooses instead to engage in a more extensive analysis of the nature of Plaintiffs' claims, namely, whether they arise under federal or state law, *infra* in section IV.

**II.**    **Res Judicata and Collateral Estoppel**

       Defendants also argue Plaintiffs' claims are barred by the doctrines of *res judicata* and collateral estoppel.  Def's Mem. at 39.  "Under both New York law and federal law, the doctrine

17

of *res judicata*, or claim preclusion, provides that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Malcolm v. Bd. of Educ. of Honeoye Falls-Lima Central Sch. Dist.*, 506 F. App'x 65, 68 (2d Cir. 2012) (internal brackets and quotation marks omitted).  Whether a state court judgment constitutes a final judgment on the merits is determined by the law of the rendering state.  *See DDR Const. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 647 (S.D.N.Y. 2011) (stating this proposition); *see also Cloverleaf Realty of New York, Inc. v. Town of Wawayanda*, 572 F.3d 93, 95 (2d Cir. 2009) (same).  "Under New York Law, a dismissal pursuant to N.Y. C.P.L.R. 3211(a)(7), for failure to state a cause of action, is presumptively not on a case's merits and lacks *res judicata* effect." *DDR Const. Servs., Inc.*, 770 F. Supp. at 647.  "Absent an affirmative indication that a § 3211(a)(7) dismissal constitutes a decision on the merits, that dismissal precludes, at most, relitigation of the sole issue decided, *i.e.* whether the dismissed complaint states a cause of action under the applicable pleading standards." *Mejia v. City of New York*, 17-CV-2696, 2020 WL 2837008, at *9 (E.D.N.Y. May 30, 2020) (Garaufis, J.) (referencing *Blake v. City of New York*, 41 N.Y.S.3d 755, 757 (2d Dep't 2016)).

Some courts have held dismissal pursuant to CPLR § 3211(a)(7) is only considered to have been decided on the merits of a case "if the rendering court explicitly says so." *Id*.  Courts within this District have also ruled "[a] granted motion to dismiss is generally not *res judicata* of the entire merits of a case, but only of the point actually decided." *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 264 (E.D.N.Y. 2004) (Weinstein, J.) (internal citations omitted). Courts are generally "reluctant to find the dismissal of a prior complaint on the pleadings sufficient to preclude a second action." *Id.*  Thus, in instances where a case was dismissed due to an

insufficiency of the pleadings pursuant to CPLR § 3211(a)(7), a new action that remedies the deficiency is not generally precluded. *Id.*

In April 2016, Plaintiffs filed an action against Defendant NYSDEC in New York State Supreme Court in Queens County, captioned *Unkechaug Indian Nation v. N.Y. State Dep't of Env't Conservation*, Index No. 4254/2016. *See* Kreshik Dec., ECF No. 102, Ex. D (Plaintiffs' State Court Complaint). Many of Plaintiffs' allegations in that case mirror those presently before this Court. *Id.* (Plaintiffs alleged, *inter alia,* Defendant NYSDEC violated the Nation's sovereign fishing rights and interfered with Plaintiffs' cultural and religious practices by enforcing the State's fishing regulations. Specifically, Plaintiffs brought their suit after state and federal law enforcement officers seized roughly $40,000.00 of glass eels—which were subject to NYSDEC's American eel regulations— and which the Unkechaug planned to export to Hong Kong).

In July 2016, Defendants moved to dismiss Plaintiffs' state court action pursuant to CPLR § 3211(a)(7) on the grounds Plaintiffs failed to state a claim. *See* Kreshik Dec., Ex. F (Def's 2016 Mot. to Dismiss). With respect to Plaintiffs' request for prospective injunctive relief authorizing the Unkechaug to take and possess glass eels, Defendants alleged (1) "Plaintiff cites no legal authority showing that it has any legal right to take or possess glass eels in contravention of New York State law"; and (2) "Plaintiff has failed to cite to any cases or treaties showing that it has any legal right to circumvent the American Eel Fishery Management Plan or New York State Law, both of which prohibit the taking and possession of glass eels." *Id.* at 13.

In October 2016, the Honorable Justice Robert L. Nahman granted Defendants' motion. *See* Kreshik Dec., Ex. I (New York Supreme Court Order). Justice Nahman determined "the branch of the defendant's motion to dismiss the plaintiff's complaint upon the grounds that the complaint fails to state a cause of action [pursuant to CPLR § 3211(a)(7)] is granted without

opposition to the extent that the branches of plaintiff's complaint which seek injunctive relief are dismissed." *Id.* at 2.

This Court finds Justice Nahman's 2016 order is not a final judgment on the merits and thus declines to give it *res judicata* effect. Where a case is dismissed pursuant to CPLR § 3211(a)(7) for failure to state a claim, unless the presiding court indicates otherwise, the case is generally not considered a final judgment on the merits for the purposes of determining claim preclusion. *See DDR Const. Servs., Inc.*, 770 F. Supp.; *Beretta U.S.A. Corp.*, 315 F. Supp.; *Cloverleaf Realty of New York, Inc.*, 572 F.3d. Justice Nahman "did not state that the decision was on the merits, that the dismissal was with prejudice, or that Plaintiff[s] could not conceivably allege a set of facts that would support [their] claims." *Mejia*, 2020 WL 2837008, at * 9. Accordingly, Plaintiffs' instant claims are not precluded.

Defendants also argue this action is barred from review by the related yet distinct doctrine of collateral estoppel, which "prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *See* Def's Mem. at 39 (quoting *Burton v. Undercover Officer*, 671 F. App'x 4, 4-5 (2d Cir. 2016)). This doctrine applies when "1) the identical issue was raised in a previous proceeding, 2) the issue was actually litigated and decided, 3) the party had a full and fair opportunity to litigate the issue, and 4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Burton*, 671 F. App'x at 4-5 (citing *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288-89 (2d Cir. 2002)).

Having just found Plaintiffs' 2016 state court action was not adjudicated as a final judgment on the merits, this Court declines to reiterate this point further.

III.     **Preemption**

    A.     NYSDEC'S Regulations are Not Preempted by Federal Law

When federal and state law conflict, the federal law displaces, or preempts, the state law pursuant to the Supremacy Clause.  U.S. const. art. VI.   In order to "win preemption of a state law[,] a litigant must point specifically to a constitutional text or a federal statute that [displaces] or conflicts with state law."  *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019).   In considering federal preemption claims, courts adhere to two fundamental principles: (1) "every preemption case starts with the presumption that Congress did not intend to displace state law," and (2) Congress's preemptive intent is adduced "by examining the federal scheme as a whole and identifying its purpose and intended effects." *Pet Welfare Ass'n, Inc. v. City of N.Y.*, 850 F.3d 79, 86 (2d Cir. 2017) (citing *Wyeth v. Levine*, 55 U.S. 555, 565 (2009)).

The presumption against federal preemption is especially strong in fields "the States have traditionally occupied[,]" including areas affecting States' police powers.  *Wyeth*, 55 U.S. at 565. *Id.*  In such cases, Congress's preemptive purpose must be "clear and manifest" to overcome the presumption against preemption.  *Id.*

Fish management is one such area that is traditionally reserved for the States pursuant to their police powers.  *See State of N.Y. v. Locke*, 08-CV-2503, 2009 WL 1194085, at *2 (E.D.N.Y. 2009) (Weinstein, J.) ("The management of fisheries within state waters, including inland waters and coastal waters extending three miles seaward from shore, is subject to regulation by the states under their police powers."); *Aqua Harvesters, Inc. v. DEC*, 17-CV-1198, 2019 WL 3037866, at *25 (E.D.N.Y. July 11, 2019) (Azrack, J.) (finding states' legal authority to manage their fisheries arises from their police powers).  Therefore, to succeed in their claim that NYSDEC's fishing regulations are federally preempted, Plaintiffs must not only point to a specific provision of federal

law that conflicts with these regulations; they must also show a clear and manifest intention on the part of Congress to displace the State's laws in this area.  Plaintiffs have done neither here.

Plaintiffs argue N.Y.C.R.R. §§ 10.1 (a) and (b) and 40.1(f) and (i), which limit fishing for American eels under nine inches in length and which were promulgated pursuant to New York's obligations as a ASMFC Member State, are preempted by 25 U.S.C. 232 and the Andros Order—a purported instrument of federal law.  Pls. Mem. at 77-80.  *See also New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 528–29 (2d Cir. 2010) (discussing ASMFC Member States' general obligations); 16 U.S.C. § 5104 (setting forth States' ASMFC implementation requirements ("Each State identified under subsection (a) with respect to a coastal fishery management plan shall implement and enforce the measures of such plan within the timeframe established in the plan.")).  This is not so. Indeed, the regulations in question are not preempted by federal law.

The sole federally enacted statute Plaintiffs cite, 25 U.S.C. § 232,  does not limit the State's regulatory authority vis-à-vis Native Americans and Native American Reservations.  In fact, it extends it.  25 U.S.C. § 232 ("The State of New York shall have jurisdiction over offenses committed by or against Indians on Indian reservations within the State of New York to the same extent as the courts of the State have jurisdiction over offenses committed elsewhere within the State as defined by the laws of the State[.]").  *See also United States v. Cook*, 922 F.2d 1026, 1033 (2d Cir. 1991) ("The plain language of the statute leads us to conclude that section 232 extended concurrent jurisdiction to the State of New York.").  Plaintiffs attempt to circumvent the statute's plain meaning by emphasizing the provision's limiting clause, namely, "[t]hat nothing contained in this section shall be construed to deprive any Indian tribe, band, or community, or members thereof,[] hunting and fishing rights as guaranteed them by agreement, treaty, or custom, nor require them to obtain State fish and game licenses for the exercise of such rights."  25 U.S.C. §

232. However, this attempt is unavailing. *See Lee v. Bankers Trust Co*., 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms."); *see also Shinnecock Indian Nation v. Kempthorne*, 06-CV-5013, 2008 WL 4455599, at *11 (E.D.N.Y. Sept. 30, 2008) (Bianco, J.) (finding, *inter alia*, 25 U.S.C. § 232 "relate[s], respectively, to New York State's jurisdiction over crimes committed on Indian reservations and civil actions involving Indian litigants" thereby refusing to "strain [this] statute[] beyond [its] plain and unambiguous meaning.").

Plaintiffs fail to cite any operative agreement or treaty needed to substantiate a federal preemption claim premised on 25 U.S.C. § 232. Nor do they persuasively argue their customary fishing rights are irreconcilable with N.Y.C.R.R. §§ 10.1 (a) and (b) and 40.1(f) and (i). The sole treaty rights Plaintiffs invoke derive exclusively from the Andros Order, an agreement entered into in 1676 by the English colonial Governor, Edmund Andros, and the Unkechaug, purportedly extending to the Nation the right to fish freely. Pl. Mem. at 35. This legal instrument does not nor could not serve as grounds upon which to rest Plaintiffs' federal preemption claims as it is not itself federal law. *See infra* section IV. As for their customary fishing rights, Plaintiffs overlook the well-established principle that these rights are subject to limitations.

Plaintiffs claim they have a customary right to "fish freely on reservation waters and in customary fishing waters." Pl. Mem. at 25. *But see id*. at 77 (Plaintiffs later clarify "The Unkechaug is not asking for exclusive rights to fish in customary waters, only their treaty rights to fish and to freely dispose of their catch."). By stating "fish freely," Plaintiffs seem to suggest they are free from government regulations altogether. *See* Compl. at 13 ¶ 1 (Plaintiffs' prayer for relief seeking, *inter alia*, a declaratory judgment that: "the Nation, Harry B. Wallace as Chief and individually, its officials, and its *Reservation waters and customary Unkechaug fishing waters are*

23

*immune from NYSDEC and Commissioner Basil Seggos fishing regulations* and that the NYSDEC

and Commissioner Basil Segos lack authority to enforce fishing regulations under New York State

Environmental laws against the Nation, Harry B. Wallace as Chief and individually, its officials

and employees.") (emphasis added).

Plaintiffs are not simply asking the Court to declare Plaintiffs' right to self-govern on

reservation lands.  Plaintiffs are asking the Court to declare a far greater right: to be immune from

New York State's authority to regulate fishing *off* reservation lands—including in areas quite far

from Unkechaug Reservation lands.  This is a right Plaintiffs do not have.

Plaintiffs claim, at a minimum, "customary Unkechaug fishing waters" extend to

"Poospatuck Bar, off the reservation land[.]" *Id.* ¶ 32.  However, Plaintiff Chief Wallace suggested

these bounds extend even further still.  In fact, Chief Wallace would essentially remove all

boundaries confining Unkechaug customary waters entirely.  *See* Plaintiff Wallace's Rule 30(b)(6)

Dep. Tr. ("Wallace Tr."), ECF No. 103, Ex. A.  Consider this exchange during Plaintiff Wallace's

Rule 30(b)(6) deposition, which took place on Tuesday, January 28, 2020:

> Q: What are the extent of the traditional waters that you claim the Unkechaug have the
> unlimited right to fish?
> A: Where the fish travel.
> Q: So anywhere fish go?
> A: Anywhere fish go.
> Q: So the Forge River?
> A: Yes.
> Q: The whole shore of Long Island?
> A: Yes.
> Q: Hudson River?
> A: Yes.
> Q: Atlantic Ocean?
> A: Yes.

*Id.* at 137-38:18-6.  Plaintiff Chief Wallace's answers, taken in conjunction with Plaintiffs'

prayer for relief, suggests Plaintiffs are asking this Court to declare them entirely immune from

the States' regulatory authority anywhere—regardless of whether the State seeks to enforce said regulations on or *off* reservation lands, as is the case here.  This is a step too far.

This Court need not determine the bounds of the Nation's customary fishing rights in order to find, as it does, Plaintiffs' fishing rights are not without limits. It is well-established that States may impose and enforce certain regulations on such rights.  *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 204–05 (1999) (stating, even when there exists a binding treaty between the Federal Government and an Indian nation—which is notably not the case here— "Indian treaty-based usufructuary rights do not guarantee the Indians 'absolute freedom' from state regulation.") (quoting *Oregon Dept. of Fish and Wildlife v. Klamath Tribe*, 473 U.S. 753, 765 n.16 (1985)).  Indeed, where, as here, the state seeks to regulate in the interest of conservation, the Supreme Court has "repeatedly affirmed state authority" to regulate Indian fishing rights.  *See id.* at 205 (noting the Supreme Court has "repeatedly affirmed state authority to impose reasonable and necessary nondiscriminatory regulations on Indian hunting, fishing, and gathering rights in the interest of conservation.") (referencing *Washington v. Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U.S. 658, 682 (1979); *Antoine v. Washington*, 420 U.S. 194, 207–08 (1975); *Puyallup Tribe v. Department of Game of Wash.*, 391 U.S. 392, 398 (1968)); *accord Herrera v. Wyoming*, 139 S. Ct. 1686, 1695 (2019) ("States can impose reasonable and nondiscriminatory regulations on an Indian tribe's treaty-based hunting, fishing, and gathering rights on state land when necessary for conservation.").

As there is no agreement, no treaty, and no custom upon which Plaintiffs can establish their purported right to "fish freely" anywhere they so choose, the Court finds there is no basis upon which to base a federal preemption claim premised on 25 U.S.C. § 232.

IV.     **The Andros Order and Inherent Sovereignty**

A.      The Andros Order is Not Legally in Effect

As the Court's analysis in the previous section suggests, the Andros Order is not federal law, nor is it operative under state law.

1.      The Andros Order is Not Federal Law

Plaintiffs erroneously argue the United States incorporated and ratified the Andros Order by reference to Article VI of the U.S. Constitution.  Pls. Mem. at 37.  This is not so.

Article VI states in relevant part: "[a]ll. .. [e]ngagements entered into, before the adoption of this Constitution shall be as valid as against the United States under the Constitution, as under the Confederation."  U.S. Const. art. VI.  Courts have long interpreted this clause to mean agreements validly entered into *by the United States government during the confederal period* remain valid as against the new federal government under the U.S. Constitution.  *See Oneida Indian Nation of New York v. State of N.Y.*, 860 F.2d 1145, 1155 (2d Cir. 1988) ("We do not doubt that treaties made during the confederal period between the United States and Indian nations are entitled to the same respect as treaties made with foreign nations and that both equally became "the supreme Law of the Land" by virtue of Article VI of the Constitution.").  However, contrary to Plaintiffs' position, this provision does not declare all agreements entered by individual colonial governments actionable as against the federal and state governments by virtue of Article VI.  *See* Pls. Mem. at 38 (setting forth this argument).  Indeed, the scope of this constitutional provision is far more limited than Plaintiffs suggest.

Article VI addresses the legal status of the Nation's debts and engagements, specifically, those debts and engagements the United States government incurred or entered into pursuant to its powers under the Articles of Confederation, and the effect, if any, the transition from the Articles

26

to the Constitution had on the legal effect of those debts and engagements.  Contrary to Plaintiffs'

assertion, this provision does not lift all colonial treaties to the level of federal law.  *See, e.g.*, *Deeks*

*v. United States*,  04-580C, 2005 WL 6112655, at *3 (Fed. Cl. Feb. 18, 2005) (Braden, J.), *aff'd*,

151 F. App'x 936 (Fed. Cir. 2005) ("The Articles of Confederation included a provision that

protected creditors who had made loans to the United States prior to the adoption of Article XII

[of the Articles of Confederation]. This protection of creditors subsequently was included in the

United States Constitution." (citing U.S. Const. art . VI, cl. 1)); *Lunaas v. United States*, 936 F.2d

1277, 1278 (Fed. Cir. 1991); *see also* Jason Mazzone & Cem Tecimer, *Interconstitutionalism*, 132

YALE L.J. 326, 337–38 (2022) (analyzing art. VI, cls. 1 & 2) (explaining "the Constitution does

not eliminate contractual obligations *the national government assumed* under the Articles… Under

[art. VI, cl. 2] *treaties validly ratified under Article IX of the Articles of Confederation* remain in

force under the Constitution. . .") (emphasis added). Moreover, because the Andros Order was not

a treaty—and certainly not one validly ratified under Article IX of the Articles of Confederation—

art. VI, cl. 1 has no bearing on Plaintiffs' claim.

The Andros Order is an executive order of New York's English Governor and his council,

as confirmed by the minutes of the meeting between the Unkechaug and the Governor, as well as

by the text of the Order itself.  Nowhere in the meeting minutes nor in the text of the Order is there

any indicia the Unkechaug and the Governor—on behalf of the colonial State of New York –were

entering into a treaty.  *See* Andros Order and Meeting Minutes, ECF No. 103-10.  Indeed, as

Defendants note, the word "treaty" does not appear in the document,  while "the word 'order'

appears five times. . . the word 'liberty' twice, and 'leave' and 'privilege' once each."  Def. Mem.

at 69.  The Order's language stands in stark contrast to contemporary treaties of the time between

the colonies and Native American tribes, as the latter characteristically include express language

setting forth the parties and terms, as well as the bargained-for consideration, of the agreement. *Id.* at 69-70 (referencing Thompson Dec. Ex. L, ECF No. 103-12 (a 1646 treaty between Virginia and the Powhatan Indians which refers to itself as "articles of peace"); Thompson Dec. Ex. M, ECF No. 103-13 at 2-3 (the 1664 Fort Albany Treaty with the "New York Indians" which similarly refers to itself as "Articles made and agreed to"); Thompson Dec. Ex. N, ECF No. 103-14 (the 1666 agreement between Maryland and eleven Native American tribes, also referred to as "Articles of peace & amity."); Thompson Dec. Ex. O, ECF No. 103-15 ("The 1677 Treaty of Middle Plantation referring to itself as "Articles and Overtures, for the firm Grounding, and sure Establishment of a good and just Peace with the said Indians[.]"); Thompson Dec. Ex. P, ECF No. 103-16 (the 1638 Treaty of Hartford between the "English in Connecticut" and several Native American tribes is referred to as "Articles of Agreement" and "A Covenant and Agreement.")).

Both the phrasing of the Andros Order and the historical context of the meeting between the Unkechaug and the Governor militate against this Court finding the Andros Order is a treaty. As the meeting minutes indicate, on May 23, 1676, the Unkechaug came to Governor Andros with the "desire. . . that they may have leave. . . to fish and dispose of what they shall take, as to whom they like best." Andros Order and Meeting Minutes at 2. The Unkechaug made this request upon their allegations "the English have come and taken [their fish] away from them per force." *Id.* The Governor reserved his decision until the following day. *Id.*

As the meeting minutes dated May 24, 1676 explain, the Unkechaug came to meet with Governor Andros again, this time in the presence of his council, seeking an Order "grant[ing] them as to their free liberty of fishing[.]" *Id.* at 3. "[T]o shew for their privilege[,]" the Governor, in council, granted the Unkechaug the order they sought, declaring "[the Unkechaug] are at liberty and may freely whale or fish. . .as they thinke good according to law and Custome of the

Government. . ." *Id.*  The plain meaning of the Order, and the surrounding context, make clear the Governor was not bargaining with the Unkechaug; he was not entering into a formal treaty with the Nation on behalf of the colony; nor was he granting the Unkechaug this "privilege" as consideration for something in exchange—regardless of whether he, or the colony of New York, benefitted from this arrangement. Accordingly, the Court does not find the Andros Order was a treaty. *See Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1232–33 (2014) ("A treaty is in its nature a contract between nations, not a legislative act.") (internal citations omitted); *Georges v. United Nations*, 834 F.3d 88, 92-93 (2d Cir. 2016) ("[A] treaty is a contract . . . between nations, and is to be interpreted upon the principles which govern the interpretation of contracts in writing between individuals." (citing *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014) (internal quotation marks omitted)).

Indeed, even if the Andros Order were a treaty, which it is not, it does not operate as Plaintiffs say, which is to grant the Unkechaug immunity from all state regulation with respect to fishing.  By the instrument's own terms, the Order qualified the right of the Unkechaug insofar as they can only "freely. . . fish" to the extent their fishing was in accordance with the "law and Custome of the Government."  Andros Order at 3.  The State promulgated its fishing regulations, N.Y.C.R.R. §§ 10.1 (a) and (b) and 40.1(f) and (i), pursuant to its obligations as an ASMFC Member State, in the interest of preserving the American eel population.  The Unkechaug may fish freely in customary waters, off reservation lands, but only to the extent they adhere to the State's conservation laws.  The Andros Order does not immunize the Unkechaug from State regulation, and Plaintiffs' attempt to ground their argument to the contrary in Supreme Court case law is unpersuasive.

In particular, the Court is not convinced by Plaintiffs' invocation of the Supreme Court's decision in *Washington State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000 (2019) to argue the Andros Order's use of the phrase "they are at liberty and may freely whale of fish" prevents the State from imposing fishing regulations against them outright. Pls. Mem. at 28, 35; *See* Pls. Response, ECF No. 111 at 8. Upon careful review, the Court finds this case does not support Plaintiffs' argument. In *Cougar Den, Inc.*, the Yakama Nation challenged the imposition of Washington State's fuel tax in light of a treaty between the Yakama Nation and the United States government, which permits the Nation to travel freely on public highways. 139 S. Ct. 1000 (2019). The Supreme Court ultimately ruled in favor of the Yakama Nation, finding the State's tax interfered with the Yakamas' treaty right, and thus, the tax was preempted by federal law. *Id*. at 1011. However, important to the Court's reasoning was the fact "the Yakamas bargained in the treaty to protect their right to travel," as well as the Court's finding, in seeking the treaty with the federal government, "[the Yakamas] could only have cared about preventing the State from burdening their exercise of that right." *Id*.

*Cougar Den, Inc.* is distinguishable from the instant case for a number of reasons. First, as the Court previously established, the Andros Order is not a federal treaty but more akin to an executive order by then-colonial Governor Andros. Second, in *Cougar Den, Inc.*, using canons of Indian treaty construction, the Supreme Court determined the Yakamas not only "bargained" for their treaty rights, but they also did so with the express purpose of "preventing the state" from interfering with their right to travel to and from their reservation. *Id.* at 1010 ("Here, the Yakamas' lone off-reservation act within the State is traveling along a public highway with fuel."). Third, crucial to the Supreme Court's decision in *Cougar Den, Inc.* was the burden a state tax imposes

on a federally guaranteed treaty right.  None of these factors are present here.  Therefore, *Cougar Den, Inc.* is distinct from the case at hand and Plaintiffs' reliance upon it is unavailing.

The Andros Order is not a treaty; the rights set forth therein do not reflect the culmination of a bargained-for agreement; and the Nation seemingly sought an order declaring its rights as against English colonists—not against the colonial government—which is all evinced by the meeting minutes between the Unkechaug and Governor Andros as explained *supra*.  *See* Andros Order and Minutes.  Furthermore, the state regulations at issue here are narrow in scope, restricting fishing merely with respect to the size of the eels that may be taken and in order to preserve the species' continued existence.

Unlike *Cougar Den, Inc*, or its predecessor case, *Tulee v. State of Washington*, 315 U.S. 681 (1942), the State is not attempting to limit the Unkechaug Tribe's established right through the imposition of a tax or licensing requirement.  This type of imposition is far more burdensome than the instant regulations, hence the reason behind the Supreme Court's rulings in this arena. *See Tulee*, 315 U.S at 683-84 ("Relying upon its broad powers to conserve game and fish within its borders. . . the state asserts that its right to regulate fishing may be exercised . . . outside of [the Yakima's] reservation. It argues that the treaty should not be construed as an impairment of [the Yakima's treaty right] and that since its license laws do not discriminate against the Indians, they do not conflict with the treaty. . .The license fees prescribed are regulatory as well as revenue producing. But it is clear that their regulatory purpose could be accomplished otherwise, that the imposition of license fees is not indispensable to the effectiveness of a state conservation program. Even though this method may be both convenient and, in its general impact fair, it acts upon the Indians as a charge for exercising the very right their ancestors intended to reserve. We believe

that such exaction of fees as a prerequisite to the enjoyment of fishing in the 'usual and accustomed places' cannot be reconciled with a fair construction of the treaty.").

      2.      The Right to Freely Fish Does Not Immunize the Unkechaug from State Fishing Regulations

          a)      *The Conservation Necessity Principle*

The Supreme Court has consistently held states may impose reasonable, nondiscriminatory regulations on off-reservation lands in the interest of conservation necessity. *See, e.g.*, *Herrera v. Wyoming*, 139 S. Ct. 1686, 1695 (2019) ("States can impose reasonable and nondiscriminatory regulations on an Indian tribe's treaty-based hunting, fishing, and gathering rights on state land when necessary for conservation."); *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 at 204–05 (1999) ("This 'conservation necessity' standard accommodates both the State's interest in management of its natural resources and the [Native American tribe's] federally guaranteed treaty rights. . . Thus. . .  treaty rights are reconcilable with state sovereignty over natural resources."); *Antoine v. Washington*, 420 U.S. 194, 207 (1975) (holding that in accordance with the conservation necessity doctrine, states must show "the regulation meets appropriate standards and does not discriminate against the Indians," and that "its regulation is a reasonable and necessary conservation measure, and that its application to the Indians is necessary in the interest of conservation." (quotation and internal citation omitted)).

Indeed, the Supreme Court in *Puyallup Tribe* expressly dealt with this issue.  391 U.S. 392 (1968).  There, the Court held while Washington State could not "qualify" the Tribe's right to fish—guaranteed to them by a federal treaty, the Treaty of Medicine Creek—the State could nevertheless regulate the manner in which the Puyallup fished.  *Id.* at 398 (the Treaty granted the Puyallup "the rights to fish 'at all usual and accustomed places.'").  Specifically, the Court held "the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may

32

be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." *Id.* This same applies here. The State has a clear interest in conserving the American eel population, and it has imposed reasonable, non-discriminatory regulations in furtherance of this interest. *See* Pls. Mem. at 56-57 (reiterating the important nature of the State's interest and outlining the equal basis upon which the State's law is applied). In accordance with the Supreme Court's jurisprudence in this area, the Court finds Defendants' regulations comport with the well-established conservation necessity principle and thus permissibly confine Plaintiffs' fishing rights.

The Supreme Court's holding in *People of the State of New York ex rel. Kennedy v. Becker*, 241 U.S. 556 (1916) further supports this Court's position. There, the Court rejected the Seneca Nation's argument that the Treaty of Big Tree prohibited the State of New York from regulating their off-reservation fishing despite the existence of an agreement which provided members of the Nation with "the privilege of fishing and hunting on [certain off-reservation] lands." *People ex. rel. Kennedy v. Becke*r, 215 N.Y. 42, 44, 45 (1915). Writing for a unanimous court, Justice Hughes explained the Seneca Nation sought "the denial with respect to these Indians . . . of all state power of control or reasonable regulation as to lands and waters otherwise admittedly within the jurisdiction of the State." *Becker*, 241 U.S. at 562. However, the Court held the Seneca's supposed treaty right with respect to off-reservation lands was best construed as "a reservation of a privilege of fishing and hunting upon the granted lands in common with the grantees, and others to whom the privilege might be extended, but subject, nevertheless, to that necessary power of appropriate regulation, as to all those privileged, which inhered in the sovereignty of the state over the lands where the privilege was exercised." *Id.* at 563–64. This Court finds the same holding and reasoning applies to the Unkechaug's fishing rights here.

33

3.      The Andros Order has No Force Under State Law

The preceding section assumes *arguendo* Plaintiffs have a "valid and enforceable" right as a matter of state law.  Pls. Mem. at 37.  However, the Court does not necessarily find this is the case.  The Court disagrees with Plaintiffs that New York State's Constitution incorporated the Order into State law, and agrees with Defendants that whatever legal effect the Order once had, it has long since been abrogated.  *See* N.Y. Gen. Constr. Law § 71 ("Acts of the legislature of the colony of New York shall not be deemed to have had any force or effect in this state since December twenty-ninth, eighteen hundred and twenty-eight."); *see also* N.Y. Gen. Constr. Law § 72 (McKinney) ("The resolutions of the congress of the colony of New York and of the convention of the state of New York, shall not be deemed to be the laws of this state hereafter.").

Plaintiffs claim the Andros Order remains legally effective today pursuant to, *inter alia*, article 1, section 14 of the Constitution of the State of New York.  Pls. Mem. at 105 ("[The Andros Order] and the relationship between Unkechaug and settlers continued under the terms of the treaty and was further ratified upon the formation of the United States and the State of New York. As indicated in both constitutions. Section 14 of the Constitution of the State of New York and Article VI. Sec (1) of the U.S. Constitution.").  The applicable provision of the State's Constitution reads:

> Such parts of the common law, and of the acts of the legislature of the colony of New York, as together did form the law of the said colony, on the nineteenth day of April, one thousand seven hundred seventy-five, and the resolutions of the congress of the said colony, and of the convention of the State of New York, in force on the twentieth day of April, one thousand seven hundred seventy-seven, which have not since expired, or been repealed or altered; and such acts of the legislature of this state as are now in force, shall be and continue the law of this state, subject to such alterations as the legislature shall make concerning the same. But all such parts of the common law, and such of the said acts, or parts

34

thereof, as are repugnant to this constitution, are hereby abrogated. *See* N.Y. Const. art. 1 § 14 (Formerly N.Y. Const. art. 1 §16. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938).

However, Plaintiffs' assertion is incorrect. New York State's constitution incorporates (1) *legislative acts* entered into by the State's former colonial government which were still in effect on April 19, 1775, and (2) *congressional resolutions* passed by the State's colonial-era congress or by State convention, still in force on April 20, 1777—unless subsequently altered or abrogated by the State. N.Y. Const. art. 1 § 14. By its plain language, New York's Constitution does not incorporate into state law colonial era agreements that are neither (1) legislative acts nor (2) congressional resolutions. Construed as either a treaty or, better, as an executive agreement, the Andros Order is neither a legislative act nor a congressional resolution. Therefore, it has no legal effect under New York State law by virtue of art. 1 § 14 of the State's constitution. Moreover, the Court is convinced by Defendants' argument; whatever legal effect the Andros Order may have previously possessed, it no longer does so today.

However, the Supreme Court has held a "treaty will not be deemed to have been abrogated or modified by a later statute unless such *purpose* on the part of Congress has been clearly expressed." *Cook v. United States*, 288 U.S. 102, 120 (1933). The Second Circuit has interpreted this ruling to mean "the question of abrogation does not turn on whether the [law] has been expressly identified for abrogation." Rather, "[w]hat is required is a clear expression by Congress of a purpose to override protection that a treaty would otherwise provide." *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 124 (2d Cir. 2000). And it is clear from New York's navigation and environmental laws, New York's legislature has purposefully sought to regulate fishing and off-reservation waters within the State continuously and deliberately in the many years since

35

colonial Governor Andros signed his order.  *See* N.Y. Navigation Law § 30 (the State has asserted "jurisdiction over navigation on the navigable waters of the state" and declared that nothing authorized by that law "shall be construed to convey any property rights, either in real estate or material, or any exclusive privilege; nor authorize any injury to private property or invasion of private rights or any infringement of federal, state or local laws or regulations. . ."); ECL § 11-0105 (declaring the State "owns all fish, game, wildlife, shellfish, crustacea and protected insects in the state, except those legally acquired and held in private ownership. Any person who kills, takes or possesses such fish, game, wildlife, shellfish, crustacea or protected insects thereby consents that title thereto shall remain in the state for the purpose of regulating and controlling their use and disposition.").  Thus, while not essential to the Court's holding here, the Court nevertheless concurs with Defendants to the extent it finds, were the Andros Order once in effect, it has long since been abrogated by the State.

## V.    Free Exercise

### A.    Plaintiffs' First Amendment Claims Lack Merit

Without addressing Defendants' claim that "Plaintiffs are not entitled to relief on the Free Exercise claims because they are factually deficient, time-barred, lacking standing, and/or unpled[,]" the Court nevertheless reaches the same conclusion on the merits.  Def. Mem. at 52.

Plaintiffs claim "the Unkechaug Indian Nation cherished and used shells of crustaceans fished from the Moriches Bay and customary Unkechaug fishing waters to make wampum" and that "the NYSDEC and Commissioner Seggos has [sic] attempted to regulate the fishing of crustaceans by the Unkechaug Indian Nation that would interfere with the religious expression of the Nation and limit the making and use of wampum for its religious and cultural ceremonies." Compl. ¶¶ 47-50.  The Complaint alleges further "the restriction by the state on fishing and

obtaining the shells to make wampum violates [the Nation's] religious practice and expression through the creation and use of the sacred wampum." *Id.* ¶ 50.

Plaintiffs' free exercise claims fail.   The Free Exercise clause of the First Amendment does not "relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Commack Self-Service Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 210 (2d Cir. 2012) (quoting *Employment Division v. Smith*, 494 U.S. 872, 879 (1990)). "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

The effect of New York State's fishing regulations on Plaintiffs' religious practices, if any, is incidental.   The regulations do not "discriminate[] against some or all religious beliefs or regulate[] or prohibit[] conduct *because* it is undertaken for religious reasons." *Id*. (emphasis added).   Moreover, the regulations do not target Plaintiffs' religious beliefs in any way, nor is "the object of [the regulations][] to infringe upon or restrict practices because of their religious motivation[.]" *Id.* (referencing *Smith*, 494 U.S. at 878-79).   "[I]f prohibiting the exercise of religion . . . is not the object of the [law] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." *Smith*, 494 U.S. at 878 (comparing *Citizen Publishing Co. v. United States*, 394 U.S. 131, 139 (1969) (upholding application of antitrust laws to press), with *Grosjean v. American Press Co.*, 297 U.S. 233, 250–251 (1936) (striking down license tax applied only to newspapers with weekly circulation above a specified level), and referencing *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581 (1983)).

Nothing in the text or statutory history surrounding New York's fishing regulations, 6 NYCRR §§ 10.1 (a) and (b) and 40.1(f) and (i), or in ECL § 25-0401—which Plaintiffs do not cite but which regulate dumping (or transferring waste)—suggest the laws target religion in any way. The former makes it illegal to take or possess American eels less than nine inches within the State, and the latter makes it illegal to, *inter alia*, "dump either directly or indirectly, of any soil, stones, sand, gravel, mud, rubbish, or fill of any kind" into a "tidal wetland area" without a permit, while allowing for the "depositing or removal of the natural products of the tidal wetlands by recreational or commercial fishing, shellfishing, aquaculture, hunting or trapping, . . . where otherwise legally permitted." *See* 6 NYCRR §§ 10.1 (a) and (b) and 40.1(f) and (i); ECL § 25-0401.  Moreover, the Court's analysis *supra* regarding the context of the State's fishing regulations-- specifically, the State's adoption thereof pursuant to its ASMFC obligations—indicate the State did not implement these laws with an eye to religion.  Accordingly, the Court agrees with Defendants: rational basis review applies, which Defendants easily pass. *See Fortress Bible Church v. Feiner*, 694 F.3d 208, 220 (2d Cir. 2012) ("[W]here the government seeks to enforce a law that is neutral and of general applicability, it need only demonstrate a rational basis for its enforcement." (quoting *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) (internal quotation marks omitted))).

"Under the rational basis test, a statute will be upheld 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Roman Catholic Diocese of Rockville Ctr. v. Inc. Vill. Of Old Westbury*, 128 F. Supp. 3d 566, 581 (E.D.N.Y. 2015) (Chen, J.) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).  Defendants clearly articulate the State's rationale behind its regulations.

With respect to ECL § 25-0401, Defendants note the law "was enacted to further 'the public policy of this state to preserve and protect tidal wetlands, and to prevent their despoilation and destruction, giving due consideration to the reasonable economic and social development of this state.'"  Def. Mem. at 54 (quoting ECL § 25-0102 and referencing 6 N.Y.C.R.R. § 661.2 ("Tidal wetlands constitute one of the most vital and productive areas of the natural world and collectively have many values. These values include, but are not limited to, marine food production, wildlife habitat, flood and storm and hurricane control, recreation, cleansing ecosystems, sedimentation control, education and research, and open space and aesthetic appreciation, as set forth in the legislative findings contained in Section 1 of Chapter 790 of the Laws of 1973. Therefore, the protection and preservation of tidal wetlands are essential.")).  With respect to New York's laws limiting fishing for American eels, Defendants make clear these regulations were enacted pursuant to the ASMFC's FMP and its addenda as required by 16 U.S.C. § 5104 with the express purpose of conserving the species' population and in response to peer-reviewed findings that American eel numbers were dwindling.  *Id.*  Therefore, the Court finds the laws at issue "unquestionably bear a rational relationship to New York's interest in protecting its natural resources, both wildlife and tidal wetlands."  *Id.*

**<u>CONCLUSION</u>**

For the foregoing reasons, Defendants' Motion for Summary Judgment at ECF No. 98 is GRANTED, and Plaintiffs' Motion for Summary Judgment at ECF No. 104 is DENIED.  The Clerk of Court is directed to terminate the motions pending at ECF Nos. 85, 88, 98, and 104 and to close the case.

**SO ORDERED.**

**s/ WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: June 16, 2023
      Brooklyn, New York